2022 IL App (1st) 220064-U
Order filed June 23, 2022

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-0064

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* L.A., M.A., A.A., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| (People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 14 JA 271 |
| | ) | 14 JA 272 |
| v. | ) | 16 JA 551 |
| | ) | |
| Amari H., | ) | Honorable |
| | ) | Maxwell Griffin, Jr. and |
| Respondent-Appellant). | ) | Nicholas Genaopoulos, |
| | ) | Judges, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the findings of the circuit court that the mother was unfit to parent her children over her objections that the findings were against the manifest weight of the evidence and her counsel was ineffective at the fitness hearing. We also affirm the findings that it was in the children's best interest that the mother's parental rights be terminated as those findings were not against the manifest weight of the evidence.

¶ 2    Respondent-appellant, Amari H., is the mother of daughters M.A. (born November 14, 2011), L.A. (born December 16, 2013) (collectively, the older daughters), and A.A. (born January 2, 2015) (collectively, the children).[1] M.A.'s father is Mario A.; A.A.'s father is Darius A. The father of L.A. is unknown. After finding that the children were abused and neglected, the parents were unfit, and the termination of parental rights was in the children's best interest, the circuit court terminated the parental rights of the mother and the fathers.[2] On appeal, the mother argues that the findings of unfitness were not supported by the evidence, her trial counsel was ineffective in failing to introduce favorable evidence at the fitness hearing, and the circuit court erred in finding that termination of her parental rights was in the children's best interest. We affirm.

¶ 3    On February 12, 2014, M.A. suffered a black eye and bilateral burns to her hands while in the care of Darius A., the mother's boyfriend. Two days later, the mother brought M.A. to the hospital. M.A.'s treating physicians concluded that her injuries were the result of abuse.

¶ 4    On March 20, 2014, the State filed petitions for adjudication of wardship as to M.A. and L.A., which asserted that they had been abused and neglected based on the circumstances of M.A.'s injuries. The court granted temporary custody of the older daughters to the Department of Children and Family Services (DCFS), allowed the mother supervised day visitations, and appointed the Cook County Public Guardian as guardian *ad litem* (GAL) for M.A. and L.A. DCFS placed the older daughters in the home of their maternal grandfather (grandfather).

---

[1] The mother has a fourth daughter, Ar. H., born in 2017, who is the subject of Case No. 17 JA 739, which is not a part of this appeal. A.A. and Ar. H. will sometimes be referred to as the younger daughters. Darius A. is the father of Ar. H.

[2] Mario A. did not file a notice of appeal in this case. Darius A. filed a notice of appeal (1-22-0016); his appellate counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). On June 23, 2022 we granted that motion and affirmed the circuit court's orders finding Darius A. unfit and terminating his parental rights. After publication notice, the circuit court entered a default against the unknown father of L.A.

¶ 5 On November 3, 2014, the court held an adjudicatory hearing at which the parties entered a stipulation as to certain facts and testimony and exhibits were entered into evidence. The stipulation established that on February 12, 2014, M.A. was in the care of Darius A.,[3] while the mother was shopping. He called the mother to tell her that M.A. had a black eye and had been hurt while playing with water in the bathroom. The mother returned to the home four hours later; she did not bring M.A. to a doctor for fear of DCFS involvement. Two days later, when M.A. woke screaming, the mother brought M.A. to Metro South Hospital where she was found to have second degree burns to both hands with severe blistering and swelling and a black eye. M.A. was administered morphine to ease her pain. The treating physician concluded that M.A.'s burns were indicative of immersion burns and the delay in seeking medical care constituted medical neglect as the burns had required immediate care. M.A. was transferred to Loyola University Hospital (Loyola) for advanced care. The treating physician at Loyola found that M.A. was suffering from deep partial thickness burns with severe blisters and believed she would have been in significant pain from the moment the burns occurred. In the doctor's medical opinion, M.A.'s "stocking glove burn pattern was cause for concern, since it [was] indicative of an immersion burn" and her injuries were the result of abuse. M.A. was discharged on February 24; she underwent skin graft surgery on March 13, 2014.

¶ 6 M.A.'s injuries were not consistent with the mother's explanation to hospital personnel as to how they occurred. According to the Loyola medical records, which were filed with the court, the mother reported that M.A. was injured when she and her three-year-old cousin were "dipping

---

[3] Darius A. was named as the putative father of L.A. in the petition for adjudication, as to L.A., but after DNA testing, the court found that he was not the father of L.A. He was determined to be the father of A.A. after DNA testing.

their toys in and out" of the water in the bathroom. When Darius A. discovered them, M.A. ran, slipped, and fell on her face which caused her black eye.

¶ 7    The DCFS family service plan dated September 10, 2014, indicated that the mother continued to live with Darius A., and she did not believe that he caused M.A.'s injuries. In order to achieve reunification, the mother was required to engage in services and demonstrate the ability to exercise good judgment as to the older daughters' wellbeing. The mother's progress with required services was found to be unsatisfactory as she was inconsistent with therapy and needed a second referral for parenting classes. She was participating in visitations with the older daughters.

¶ 8    After the hearing, in adjudication orders, the court found that L.A. and M.A. had been abused or neglected. In disposition orders, the court found that for some reason other than financial circumstances alone the mother was unable to care for the older daughters, reasonable efforts to prevent their removal and reunite the family had been unsuccessful, and it was in the best interest of the older daughters to be removed from the care of the mother. The court entered permanency orders which set goals of return home within 12 months and stated the mother had been engaged in services and visitations but "had not acknowledged that [M.A.'s] injuries were a result of abuse by [Darius A.] who she is still in a relationship with."

¶ 9    Prior to a May 1, 2015 court date, a February 25, 2015 DCFS service plan and an April 30, 2015 report from Melody Ellis, MA, LPC of Unity Parenting & Counseling Inc (Unity), the servicing agency for the family, were filed.

¶ 10   The service plan stated the mother was committed to reunification and regularly visited with the older daughters, but had not made substantial progress with the necessary services. The mother was to address her bad choices when in romantic relationships and her issues with avoidance and denial; she continued to live with Darius A.

¶ 11    In her report, Ellis stated that the mother initiated therapy in June 2014 and was later discharged due to missing sessions but had been reinstated. The mother then attended 17 sessions while cancelling other appointments. Ellis stated that the mother was eager for reunification with the older daughters and recommended that the mother continue with bi-weekly individual therapy and pursue parent and child psychotherapy with M.A.

¶ 12    On the court date, the court again entered permanency orders with the goals of return home within 12 months. The court found that the mother was engaged in services and visitations. A few days later, the court entered a visitation order allowing the mother supervised visitations including supervised overnight visits in the grandfather's home.

¶ 13    The mother, on October 26, 2015, moved for unsupervised overnight visitations with the older daughters. After continuations, the motion and a permanency hearing were scheduled for February 5, 2016.

¶ 14    On that date, a December 10, 2015 letter and a February 3, 2016 letter from Deborah E. Sylvestrak, M.Ed., LCPC, the Youth Department Family Counselor at Thornton Township Youth & Family Services were filed with the court. In the December letter, Sylvestrak reported that the mother and M.A. began therapy on July 16, 2015, but the mother had cancelled half of the scheduled appointments. Sylvestrak believed that the cancellations "may be an indication that [the mother] has not interpreted her indicated report as a serious offense" and like her delay in seeking treatment for M.A.'s injuries, were emblematic of her " 'wait and see' strategy when evaluating the need for curative services rather than taking action immediately."

¶ 15    However, in the February letter, Sylvestrak stated that she and the mother had agreed that the best course of counseling would be individual sessions with the mother only. After this decision, the mother attended four out of five sessions and demonstrated a desire to resume her

parental role and satisfy the DCFS requirements. Sylvestrak found the mother's prognosis was "excellent."

¶ 16    On February 5, the court entered an order allowing the mother unsupervised overnight visits with the older daughters. There was to be no contact with Darius A. or Mario A. during the visits. The court also entered permanency orders with a goal of return home within five months. The orders found that the mother was participating in visitations and had completed all reunification services but was to continue with ongoing services.

¶ 17    The March 18, 2016 DCFS service plan (initiated February 3, 2016) was filed on March 21, 2016. The plan indicated that the mother had moved to Decatur, Illinois. She was visiting with the older daughters at least weekly and had completed individual therapy, parenting classes, and parent-child psychotherapy; no further mental health services were needed. On that date, the court again set permanency goals of return home within five months.

¶ 18    The mother's first unsupervised overnight visitation with the older daughters occurred on April 4, 2016, in her Decatur home. Darius A. arrived unannounced at the home, but he ran when the mother called the police (April incident). After the April incident, at the urging of DCFS, the mother obtained an emergency order of protection (EOP) against Darius A. However, the mother did not seek a plenary order of protection (POP) and the matter was dismissed. DCFS suspended her visitations.

¶ 19    Subsequently, in other proceedings in the Circuit Court of Macon County, Sixth Judicial Circuit, the mother, on June 14, 2016, filed a verified petition for a second EOP, which set forth two incidents of abuse and harassment by Darius A., the April incident and an incident in June. According to the petition, during the April incident, Darius A. entered the mother's home when the mother, her sister (a young child), and the children were present. Darius A. pushed the mother

down the stairs, fought to get her phone, and hit her in the mouth. On June 8, Darius A. entered her home by kicking the front door (June incident). The mother ran from the house, but Darius A. chased her and was pulling her back when neighbors called the police. Darius A. then returned to the mother's house, damaged her belongings and property, but escaped before the police arrived. The court entered an EOP which prohibited Darius A. from having contact with the mother.

¶ 20 Thereafter, in these proceedings, the State, on June 27, 2016, filed a petition to adjudicate wardship as to A.A. which claimed that A.A. was neglected based on an injurious environment. To support this claim, the State alleged that the mother minimizes the injuries suffered by M.A.; there was ongoing domestic violence between the mother and Darius A.; and A.A. had been present during the April incident. Additionally, the mother never disclosed the birth of A.A. to her caseworker and needed to be reassessed for services. The court allowed DCFS to take temporary custody of A.A. and appointed the Public Guardian as GAL for A.A.

¶ 21 On June 29, 2016, the court entered an order over the mother's objection that she was allowed only supervised visitations with the children until there was a full permanency hearing.

¶ 22 On November 3, 2016, the court held an adjudication hearing as to A.A. The hearing included the parties' stipulation to certain facts and testimony and pertinent records.

¶ 23 According to the stipulation, in 2014, the mother was living with Darius A and his mother when she became pregnant with A.A. Darius A. is the father of A.A. The mother had told her caseworker that she and Darius A. were just friends. After A.A.'s birth in January 2015, A.A. "mostly stayed" with Darius A.'s mother (grandmother). DCFS was led to believe that A.A. was the mother's sister. In early 2016, the mother had completed recommended services and had moved to Decatur.

¶ 24    A DCFS investigator visited the mother's home after the April incident. During this visit, the mother denied that she let Darius A. into the home and denied that he lived there. The grandfather and A.A. were in the mother's home during the visit. The mother identified A.A. as her sister. DCFS first learned that A.A. was the mother's child in June 2016.

¶ 25    After the April incident, the mother was reassessed for services and was required to undergo domestic violence services and additional individual therapy. At the time of the hearing, the mother had not begun these services. The mother reported the June incident to her caseworker.

¶ 26    In August 2016, Darius A. pleaded guilty to charges stemming from the April and June incidents and received probation. He would later plead guilty to violating his probation based on subsequent charges where the mother was the victim and was sentenced to incarceration.

¶ 27    Several DCFS reports, including a clinical report based on a January 27, 2017 consultation, a permanency report, an integrated assessment, and a service plan approved on March 3, 2017 were before the court. The clinical report recommended that the mother receive individual therapy with a clinician who had experience working with families having a history of domestic violence, domestic violence treatment from a separate clinician, and child-parent psychotherapy. The permanency report noted that since her birth, A.A. had been living with the grandmother. Darius A. had assaulted the mother at least four times in the past year and he was incarcerated. The report stated that the mother had exercised poor judgment and an inability to keep her children safe by continuing a relationship with Darius A. after M.A. was injured, hiding the birth of A.A., and not reporting all of the domestic violence incidents which occurred in her home.

¶ 28    The permanency plan required that the mother have no contact with Darius A., maintain an order of protection against him, complete domestic violence treatment, engage in individual therapy and parent-child psychotherapy with A.A., and report incidents of domestic violence. The

mother had been consistent with supervised visitations, but DCFS was not requesting unsupervised visitations. The recommended goal was guardianship in that the mother was still in need of further services and had demonstrated poor judgment in not reporting all of the domestic violence in her home. Although the mother has a strong bond with the children and terminating the bond may cause emotional distress, the children were in need of permanency.

¶ 29 The integrated assessment compiled the assessments of the family since the older daughters were placed with DCFS. The assessment discussed the mother's poor judgment, denials as to her pregnancies, and belief that M.A.'s injuries were not caused by Darius A.

¶ 30 The family plan stated that, on February 21, 2017, a caseworker received information from a prosecutor that the mother was attacked by Darius A. on two additional occasions (in July and September 2016 (September incident)) in her home and was unable to protect herself. When asked about not reporting these other attacks, the mother said that she thought that DCFS knew about them. DCFS believed that the mother's unwillingness to be forthright showed a lack of judgement and "does not inspire the trust needed in reunification cases." The plan included a finding that the mother had not made substantial progress and "has taken significant steps backwards over the last year."

¶ 31 At the conclusion of the hearing the court entered an adjudication order finding that A.A. had been abused or neglected based on an injurious environment and a substantial risk of physical injury and a disposition order finding that the mother was unable for some reason other than financial circumstances alone to care for A.A. and placed A.A. in the custody of DCFS. The court's permanency order set a goal of return home within 12 months and stated that the mother was "awaiting individual therapy and domestic violence services and is visiting with [A.A.]."

¶ 32     In permanency orders entered on May 3, 2017, the court set a goal of return home within 12 months. In the orders, the court stated that the mother had started individual therapy and needed additional services and to take responsibility for her role in the children's removal from her care and the risks posed by her relationship with Darius A. The court directed the mother to undergo a psychological evaluation. The court also entered a visitation order allowing only supervised day visitations with the children.

¶ 33     On August 4, 2017, the court again set a goal of return home within 12 months and again directed the mother to undergo a psychological evaluation and continue services. Additionally, the court found that the older daughters' placement with the grandfather was no longer appropriate, and they were removed from his home.

¶ 34     Unity placed the older daughters in a foster home on September 8. Shortly thereafter, Unity conducted a home visit and found that L.A. and M.A. "appeared comfortable and acclimated to their new surroundings and caretaker."

¶ 35     On May 7, 2018, the court entered permanency orders setting a goal of substitute care for the children with findings that the mother "continues to need to make progress in individual therapy, parenting coaching, psychiatric services, and domestic violence services." The court also found that the children were in pre-adoptive foster homes where they were thriving.

¶ 36     The State, on June 11, 2019, presented supplemental petitions for the appointment of a guardian with the right to consent to adoption as to each of the children. The supplemental petitions alleged that the mother was unfit under 750 ILCS 50/1(D) and 705 ILCS 405/2-29 in that the mother failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (ground B) (705 ILCS 50/1(D)(b)) and failed to make reasonable efforts to correct the conditions resulting in the children's removal, or reasonable progress toward the

children's return during a nine-month period (ground m) (750 ILCS 50/1(D)(m)). The State asked that the court find the mother unfit, that her parental rights be terminated and that it was in the children's best interest that a guardian be appointed with the right to consent to adoption. The State would later file a pleading setting forth the four nine-month periods, December 28, 2015 to September 28, 2016; September 28, 2016 to June 28, 2017; March 28, 2017 to December 28, 2017; and September 28, 2017 to June 28, 2018, which pertained to the ground m claims that the mother was unfit.

¶ 37    The court on that date entered agreed permanency orders with a goal of substitute care pending a termination hearing. Similar permanency orders were entered on December 3, 2019 and the case was again continued from time to time.

¶ 38    The parental fitness portion of the termination hearing took place on October 6, October 29, and December 13, 2021.

¶ 39    At the outset of the hearing, without objection, the court took judicial notice of the children's adjudication and disposition orders, the 2016 order granting DCFS discretion for overnight visits with the mother, as well as the 2016 order suspending overnight visits, and the May 2018 orders changing the goals to termination of parental rights. Additionally, based on the parties' stipulation as to foundation, at the request of the State, the court admitted into evidence written exhibits (State's exhibits), including all of the service plans.

¶ 40    In its case in chief, the State "published" portions of the State's exhibits. As relevant here, the State's publication included the following statements.

¶ 41    According to the May 14, 2014 integrated assessment, the mother was required to engage in individual therapy, parenting classes, parenting coaching, child-parent psychotherapy, visitation, and housing services. The September 10, 2014 service plan found the mother

unsatisfactory as to her progress on treatment goals, engaging in individual therapy, and following the therapist's recommendations.

¶ 42    In the March 2017 service plan, the mother was found to have taken significant steps backward over the past year, showed poor judgment, and had been victimized by Darius A. at least four times. She was rated unsatisfactory for using skills learned from therapy and maintaining contact with Unity by her failure to report both the birth of A.A. and the domestic violence incidents in her home. The mother was re-referred to individual therapy.

¶ 43    The mother's March 2018 psychological assessment noted that her "history and psychological issues suggest she continues to have significant issues which are likely to impair her ability to provide a consistently safe, consistently responsive environment for her children. It is imperative that she recognize this and take action to address things actively, rather than denying them or retreating from them, prior to regaining custody of her children." The assessment also found that the mother "may be unwilling to self-examine her role in difficult situations and she may react internally by behaving erratically."

¶ 44    The September 13, 2018 service plan rated the mother unsatisfactory pertaining to visits with the children due to her inconsistent participation, maintaining treatment goals, and following recommendations. Similarly, the mother was rated unsatisfactory in the October 2018 service plan for her inconsistent visitation, meeting treatment goals, maintaining weekly contact with the caseworker, participating in therapy, due to inconsistent attendance, and refraining from contact with Darius A., because Unity had "uncertainty" about whether she had contacts with him. The January 10, 2019 DCFS contact notes stated that the mother and Darius A. "continue to deal with each other" but deny that is the case to DCFS and do not take accountability for M.A.'s injuries.

¶ 45    In the final service plan dated March 27, 2019, the mother was found unsatisfactory for visits, maintaining treatment goals, therapy, and taking prescribed medication, Fluoxetine, in November and December 2018.

¶ 46    Don Johnson, a case manager at Lutheran Child and Family Services, testified that he previously worked at Unity where he was assigned to the family's case for more than a year and a half. At the beginning of the case, the mother completed several services. In 2016, after the mother moved to her own home, she was granted unsupervised visits with the older daughters. However, the April incident occurred during the first unsupervised overnight visit; A.A. was also at the home during the incident. Johnson visited the home after the April incident. At that time, the mother told Johnson that Darius A. entered the home and attacked her while M.A. and L.A. were asleep. The mother identified A.A., who was at the mother's home during Johnson's visit, as her sister.

¶ 47    A few weeks later, the mother admitted to Johnson that she was the mother of A.A. The mother thought Unity knew about A.A. because she attended therapy at Unity while pregnant with A.A. A.A., who was then two years old, had been living with the grandmother. Unity placed A.A. with a foster parent.

¶ 48    In early 2017, Johnson supervised a visit with the mother and the children; the grandfather was present. Johnson asked the mother about domestic violence incidents involving Darius A. which she had not reported to Unity. The mother said there had been several incidents, but she thought Unity knew. The mother described the September incident, saying Darius A. took the same bus to Decatur, followed her to her home and attacked her there. Johnson suggested that they find the mother a new residence at a new location for her safety, but she declined, saying she liked Decatur and wanted to stay.

¶ 49 Johnson confirmed the mother was pregnant with Ar. H. during a court hearing in this case. The mother asserted that Darius A. was not the father and admitted that she had not reported her pregnancy to Unity.

¶ 50 When Johnson left Unity, the case was staffed with a supervisor, Panos Manalis. The mother's progress was determined to be unsatisfactory based on her failure to tell Unity about the domestic violence occurrences. As a result, the mother was required to be re-assessed for services, and was required to engage in domestic violence services.

¶ 51 On cross examination by the mother, Johnson said that the mother began a domestic violence program at Dove in Decatur. Although the mother signed consents for the release of progress reports, Johnson encountered problems with Dove in obtaining the reports. He believed he may have received, at the most, one report.

¶ 52 Questioned by the court, Johnson explained that A.A. was born on January 2, 2015 and he was not assigned to the case until November 2015. From other sources, Johnson first learned that A.A. was the mother's child in June 2016. At that time, he asked the mother again about A.A. The mother admitted that A.A. was her child and was living with the grandmother.

¶ 53 The mother testified that in 2014, when she was pregnant with A.A., she attended weekly therapy sessions at Unity and met with caseworkers. Unity staff never questioned her about her pregnancy. The mother admitted that she did not inform anyone at Unity about A.A.'s birth until after the April incident. Although she was not told to report a birth, because the older daughters were not in her care, the mother believed that it was "likely" that A.A. should not be with her. The mother "basically gave [A.A.] over" to the grandmother.

¶ 54     Her relationship with Darius A. ended in December 2015 and she moved to Decatur in January 2016. She did not give Darius A. her new address but speculated that his sister who lived nearby gave him this information.

¶ 55     On the night of the April incident, A.A. and the mother's sister, a young child, were also at the home. At that time, A.A. was still in the care of the grandmother. Although it was Darius A.'s weekend with A.A., the mother wanted A.A. to be there for the overnight visit.

¶ 56     The mother did not report the April incident to Johnson. After he heard about the April incident, Johnson came to her home where he saw her sister but not A.A. who was asleep at the time. It was her sister that Johnson had inquired about. The mother denied telling Johnson that A.A. was not her child. Johnson instructed her to report any subsequent domestic violence incidents. She informed Unity about the September incident.

¶ 57     After the April incident, the mother obtained an EOP but she did not know she had to take steps to extend it or to obtain a POP. In August 2016, she obtained a POP against Darius A. which terminated in August 2018. The mother did not seek another POP as the mother believed Darius A. was no longer a threat and they were communicating about "co-parenting" A.A.

¶ 58     After Ar. H.'s birth in June 2017, Unity was concerned that she continued to have contacts with Darius A. The mother testified that Ar. H. was conceived during the September incident as the result of nonconsensual sex.

¶ 59     The mother's attorney questioned her on the topic of her compliance with services and other recommendations. The mother completed parenting classes in 2015 and was successfully discharged from child-parent psychotherapy with M.A. in March 2016. At the time of the hearing, the mother was compliant with prescribed medication and was taking Paroxetine for "PTSD and anxiety."

¶ 60    After the April incident, the mother participated in domestic violence services and individual therapy at Dove, a shelter in Decatur. She found and initiated these services without a Unity referral. In 2018, Unity informed the mother that the Dove domestic violence program did not satisfy the service requirements because Dove had not provided progress reports. Unity did not make a referral to a different domestic violence program in her area. The mother did not look for another program as she was "discouraged" after choosing a wrong provider.

¶ 61    After the domestic violence incidents, the mother attempted to find alternative housing on her own but was unsuccessful. Dove assisted her in moving to a new home in 2017. The mother moved again to another location in 2019. She did not inform Darius A. of the new addresses or invite him to these homes.

¶ 62    She explained that weekly visitations with the older daughters required her to take three days off from work in order to travel back and forth by bus. At her request, the visits were changed to a biweekly schedule. Since the goal was changed to guardianship, she is only allowed one visit per month with the children. The mother keeps in contact with the children by phone and the foster parents keep her up to date on the older children.

¶ 63    On cross examination by the State, the mother denied that Johnson tried to help her move from her Decatur home after the domestic violence incidents. The mother was not sure whether Darius A. had inflicted M.A.'s burns and black eye because the mother "wasn't there." The mother "did feel like he did do that, especially after he put his hands on me" but she would not know "unless he tells me." In 2018, she was anticipating that she and Darius A. would co-parent the younger daughters upon reunification.

¶ 64    On cross examination by Darius A., the mother testified that, since getting out of jail in June 2017, Darius A. had not threatened her and no longer posed a threat. She recently has had phone contacts with him.

¶ 65    On examination by the court, the mother testified that she would be comfortable "co-parenting" with Darius A., for example, by exchanging the younger daughters at a police station or a restaurant as she had discussed this possible arrangement with a therapist. She has had conversations with Darius A. about future co-parenting and their current visitations with the younger daughters and they have exchanged pictures of them.

¶ 66    The mother then published from the State's exhibits as follows.

¶ 67    According to the March 2016 service plan, the mother successfully completed parenting classes and individual therapy and no further mental health services were recommended. She has worked on making better choices in romantic relationships and decision making for her children's safety. The screener's impressions section of the September 2016 integrated assessment stated that the mother loved and cared for the children, described their strengths and needs, was committed to reunification, and at that time had visited the older daughters almost every day. The mother had attended all of M.A.'s medical and occupational therapy appointments and demonstrated a strong understanding of M.A.'s medical needs. According to the March 2017 service plan, the mother was enrolled in a program at Dove, but Dove did not provide timely reports to Unity.

¶ 68    Darius A. testified that he was incarcerated for domestic violence toward the mother from September 2016 to June 2, 2017. Since his release, he and the mother have had limited communications relating to visitations and how they might "go about" co-parenting the younger daughters. Before observing the mother's testimony at this proceeding, he had not previously heard

the mother's account of how Ar. H. was conceived. He denied being in a current relationship with the mother.

¶ 69    At the conclusion of the fitness hearing, the court orally found the mother unfit to parent on ground b, for failing to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare, and ground m, both for failing to make reasonable efforts to correct the conditions that were the basis for the removal of the children and failing to make reasonable progress toward their return within the nine-month periods after adjudication which were both pled and proven by the State. The fathers were also found unfit.

¶ 70    The court proceeded to a best interest hearing.

¶ 71    Kenyata Smith testified that for four years she has been the foster parent of M.A., now 10, and L.A., now 7. Smith's husband, mother, and three children also live in the home. The older daughters are bonded with Smith's immediate and extended families, participate in family outings, and frequently see A.A. and Ar. H. who have been placed with Smith's cousin. Smith believes that M.A. will need counseling to deal with any future transitions and she has asked Unity for a referral and emotional counseling for L.A. The older daughters were doing well in school and had no medical issues. Smith and her husband wish to adopt the older daughters and "want them to have a stable setting." She believes that the older daughters "feel comfortable" in her home.

¶ 72    The court asked Smith if there was hesitation when she answered the question from the State about adopting the older daughters. Smith responded that she was "thrown by the question" because the State had "tabled" the issue of adoption and guardianship during prior discussions. Smith answered "no" when the court asked whether based on conversations with her family there was any reason to believe that she would not be willing to adopt the older daughters if parental rights were terminated.

¶ 73    Casea Gordon, the foster mother of A.A., testified that A.A. has been in her home for five years, since age one. Gordon is also the foster mother of Ar. H. and two other foster children. All of the children get along and participate in many activities together and with Gordon's extended family. A.A. was doing well in school and had no medical issues. A.A. has had regular contact with the older daughters and Gordon plans on continuing the contacts. Gordon wishes to adopt A.A. "[b]ecause I have grown to love her. We have a great bond. And I just want her to stay with me. *** I have been waiting for this day to happen."

¶ 74    Brandy Love, a caseworker with Unity, testified that she has been assigned to the family since October 2021. She has visited the Smith and the Gordon homes and found each home safe and appropriate. The children appear to be very bonded and attached to their respective foster parents who tend to their needs. The children's medical appointments are up to date.

¶ 75    L.A. had been referred to Unity for counseling in October 2021, but there was a long wait list. An outside counseling center had been identified. Smith had been advocating for the services.

¶ 76    Love spoke to the older daughters apart from the foster parents about their wishes. M.A. was fine with staying at the foster home. L.A. expressed a hope to be reunited with the mother, but she is still fine with living with the foster parent.

¶ 77    The mother continued to have monthly supervised visits with the children. Love thought that the foster parents would be willing to allow the mother some type of contact with the children.

¶ 78    On December 1, 2021, Unity staff met and decided on a recommendation that it was in the children's best interest to terminate parental rights. The reasons for this recommendation were that the children have been in their foster homes for an extended time, the homes provide them with stable environments and the children are attending school and after school activities and are very bonded and attached to their foster parents.

¶ 79    On cross-examination by the mother, Love testified she has supervised two or three visits with the mother and the children. The children show excitement on seeing the mother and are still bonded with her. The mother has positive and affectionate interactions with the children, and she demonstrates parental skills which were learned through services.

¶ 80    The mother testified that between visits, she speaks by phone with the older daughters, and A.A. if she is there with them, every Sunday, or at least every other Sunday. The foster parents provide updates on the children. When visiting with the children at the library she will bring snacks and they will play games or engage in library activities. The mother and A.A. enjoy looking at the library's fish tank. The mother has given the children clothes, shoes, and toys around birthdays.

¶ 81    The children call her "mommy" and recognize her as their mother; they are bonded. She described M.A. as very understanding. L.A. as very passionate and A.A. as very sweet. When asked whether the children ask about returning home with her, the mother replied, "[M.A.] does every now and then. But, [L.A.], she does every visit, every phone call."

¶ 82    At the close of evidence, the court found that it was in the children's best interest to terminate the parental rights of the mother and fathers.

¶ 83    On December 13, 2021, the court entered written termination hearing orders as to the children consistent with its oral findings. As relevant here, the termination orders found that the mother was unfit on grounds b and m, terminated the mother's parental rights, found that it was in the best interest of the children to appoint a guardian with the right to consent to their adoption, and appointed DCFS as their guardian. In disposition orders, the court set goals of adoption for the children and stated that the foster parents were willing to adopt the children. The mother appealed.

¶ 84    On appeal, the mother challenges the circuit court's findings that she was unfit to parent the children under grounds b and m, raises claims that her counsel was ineffective for failing to

introduce favorable evidence at the fitness hearing, and argues that the termination of her parental rights was not in the children's best interest.

¶ 85    The Act provides a "step-by-step" process for deciding whether a child should be removed from his or her parents and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). After a petition for wardship has been filed and a child has been placed in temporary custody, the circuit court must make an adjudicatory finding of abuse, neglect, or dependence, before it conducts an adjudication of wardship and a dispositional hearing. *Id.*; 705 ILCS 405/2-21(1), (2). The dispositional hearing and ruling on wardship give "the parents 'fair notice of what they must do to retain their rights to their child' in the fact of any future termination proceedings." *In re J.B.*, 2018 IL App (1st) 173096, ¶ 26 (quoting *In re April C.*, 326 Ill. App. 3d 225, 237 (2001)).

¶ 86    Parental rights may be involuntarily terminated where: (1) the State proves that a parent is unfit pursuant to one of the grounds set forth in section 50/1(D) of the Adoption Act and (2) the trial court finds that termination is in the child's best interest. *In re M.R.*, 393 Ill. App. 3d 609, 613 (2009); 705 ILCS 405/1-1 *et seq.* The State bears the burden of proving by clear and convincing evidence that a parent is unfit. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002). Any single ground, properly established, is sufficient for a finding of unfitness. *Id.* at 495. On review, we will only reverse a finding of unfitness where the finding was against the manifest weight of the evidence as the circuit court was in the best position to assess the credibility of the witnesses. *In re Deandre P.*, 405 Ill. App. 3d 945, 952 (2010). A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident. *Id.*

¶ 87    The mother first argues that the finding that she was unfit under ground b was in error as the evidence showed she demonstrated her commitment, interest, and concern for the children and her counsel was ineffective for failing to seek admission of favorable records.

¶ 88    Section 1(D)(b) of the Adoption Act provides that a parent may be declared unfit for "failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare." 750 ILCS 50/1(1)(D)(b). When considering an allegation under this section, "a trial court must focus on the reasonableness of the parent's efforts to show interest, concern, or responsibility and not necessarily on the success of those efforts." *In re M.J.*, 314 Ill. App. 3d 649, 656 (2000). A circuit court must also "consider any circumstances that would have made it difficult for respondent to show interest, concern, or responsibility for the wellbeing of the child." *Id.* This court has recognized that a parent may be unfit under ground b (and ground m) where he or she fails to understand the danger posed by the other parent. See *In re S.K.B.*, 2015 IL App (1st) 151249, ¶¶ 37-41; *In re H.S.*, 2016 IL App (1st) 161589.

¶ 89    The evidence established that M.A. was seriously injured while in Darius A.'s care, the burns to M.A.'s hands were the result of intentional abuse and the mother's delay in seeking treatment for the injuries constituted medical neglect. The mother's explanation as to how M.A.'s injuries occurred was wholly inconsistent with the medical findings. Throughout the case, including at the fitness hearing, the mother continued to minimize Darius A.'s responsibility for M.A.'s injuries.

¶ 90    After M.A. suffered her injuries, the mother continued to live with Darius A. and later gave birth to their daughter A.A. Rather than report A.A.'s birth and protect her from Darius A., the mother allowed Darius A.'s mother to care for A.A., expecting that Unity would take A.A.

¶ 91    When the mother stopped living with Darius A., she moved to a housing complex in Decatur where Darius A.'s sister lived; Darius A. was able to find her. He perpetrated a series of domestic violence incidents against the mother in the Decatur home. One of those incidents resulted in her pregnancy with Ar. H. When Unity finally discovered the full history of the abuse,

Johnson offered to help her find a new home in a different area so Darius A. would not know her address, but the mother declined. After the mother's POP expired, she failed to get another POP to protect the children and herself from Darius A. The mother continues to have contacts with Darius A., believes they could co-parent the younger daughters, and was accepting of the fact that he would have contact with the younger daughters. The mother's actions were contrary to the March 2017 service plan which required that she have no contact with Darius A. and maintain an order of protection against him.

¶ 92    The finding of unfitness on ground b was not against the manifest weight of the evidence. The mother failed to maintain a reasonable degree of concern and responsibility as to the children where she failed to recognize the risks posed by Darius A. to herself and the children and report the birth of A.A., her pregnancy with Ar. H., and incidents of domestic violence perpetrated by Darius A.

¶ 93    The mother argues though that the ground b finding was against the manifest weight of the evidence as she showed concern, responsibility, and interest for the children by completing some services and consistently visiting with the children. We disagree.

¶ 94    The mother did complete recommended services in 2016. However, the mother was reassessed for services after the April incident and the reassessment required that she participate in domestic violence services, individual therapy, and parent-child psychotherapy with A.A. Unity rated her unsatisfactory as to these services and the mother did not successfully complete them. After the reassessment, the mother, without a referral from Unity, pursued domestic violence treatment at Dove, which was near her home. When told that this program did not fulfill the requirement for domestic violence treatment, the mother chose not to pursue an alternative treatment program.

¶ 95    Additionally, although the mother participated in visitations with the children throughout the proceedings, those visits were for the most part supervised. And by failing to recognize the dangers that Darius A. posed, she failed to demonstrate that she could create a safe environment for the children and apply the skills she may have learned through her participation in services early on.

¶ 96    The mother argues that her counsel was ineffective for failing to seek admission of two reports in the common law record from February and March of 2016, which showed that she was rated "excellent" by Unity, participated in services, had no mental health diagnosis, had taken responsibility for her role in the removal of the children, and did not need further services.

¶ 97    A parent has a statutory right to counsel in a proceeding to terminate his or her parental rights. 705 ILCS 405/1-5(1) (West 2016); *In re Ca. B*, 2019 IL App (1st) 181024, ¶ 41. We apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), in reviewing a parent's claim of ineffective assistance of counsel in a proceeding to terminate parental rights. *Ca. B*, 2019 IL App (1st) 181024, ¶ 42. Under *Strickland*, a parent must show that counsel's performance fell below an objective standard of reasonableness and that, but for the error, a reasonable probability exists that the result of the proceeding would have been different. *Id.* (citing *Strickland*, 466 U.S. at 687-88). Failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *Id.*

¶ 98    We may dispose of the mother's ineffectiveness claim on the prejudice prong. First, during the fitness hearing, counsel elicited testimony from the mother as to her participation in services in 2015 and 2016. Additionally, the March 2016 service plan and the September 2016 integrated assessment were admitted into evidence and counsel published statements from those exhibits which revealed that the mother successfully completed parenting classes and individual therapy,

was not in need of further mental health services, was committed to reunification and better decision making and was participating in visitations. The reports at issue would have been merely cumulative. Additionally, as discussed, the mother was reassessed for services after the April incident, failed to complete those services, lost unsupervised visitations with the children, and was found to have exhibited poor judgment and decision making. Therefore, the mother has failed to show that there was a reasonable probability that the result of the fitness hearing would have been different had counsel sought to admit the two reports from earlier in the case's history.

¶ 99    We conclude that the claim of ineffective assistance of counsel is without merit and the circuit court's finding that the mother was unfit on ground b was not against the manifest weight of the evidence.

¶ 100   The mother next argues that the circuit court's finding that she was unfit under ground m was against the manifest weight of the evidence because she made reasonable efforts and reasonable progress throughout the duration of the case and her counsel was ineffective for failing to seek admission of favorable records.

¶ 101   Section 1(D)(m) of the Adoption Act, provides two grounds for which a parent can be found to be unfit: "a parent's failure to make 'reasonable efforts' to correct the conditions that were the basis for the removal of the child, and a parent's failure to make 'reasonable progress' toward the return of the child" during any nine-month period after an adjudication of neglect or abuse. *In re H.S.*, 2016 IL App (1st) 161589, ¶ 24 (citing 750 ILCS 50/1(D)(m)(i), (ii)). Reasonable progress toward the return of the child is judged on an objective standard, focusing on the steps the parent has taken toward reunification. *Id.* ¶ 27 (citing *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002)). At a minimum, the parent must make demonstrable movement toward the goal of returning the child home. *Id.* Reasonable efforts to correct the conditions that were the basis for

the child's removal is judged on a subjective review of the parent's achievements. *Id.* The court must assess whether the parent has made " 'earnest and conscientious strides' " toward correcting the conditions which led to the child's removal. *Id.*

¶ 102   The circuit court adjudicated L.A. and M.A. as abused or neglected on November 3, 2014 and adjudicated A.A. as abused or neglected on March 17, 2017. After the fitness hearing, the court in its termination orders found that the mother was unfit under ground m for failing to make reasonable efforts during the nine-month periods after the adjudication orders which were alleged by the State. We will limit our review of the ground m findings to the last nine-month period: September 28, 2017 to June 28, 2018 and in doing so consider only the evidence from this time period. *In re J.L.*, 236 Ill. 2d 329, 341 (2010). If the manifest weight of the evidence supports a finding that the mother did not make reasonable progress during this period, we may affirm the court's finding as to ground m. *In re D.F.*, 201 Ill. 2d 476, 495 (2002).

¶ 103   During this nine-month period, the mother was visiting with the children, but the visitations were supervised only and infrequent. The mother's March 2018 psychological assessment revealed that she continued to have significant issues which were likely to impair her ability to provide a consistently safe and responsive environment for the children. In its May 2018 permanency orders, the court noted that the mother "continues to need to make progress in individual therapy, parenting coaching, psychiatric services, and domestic violence services." The September 2018 service plan demonstrates that the mother did not complete the required services during this time period as it found the mother had not yet met treatment goals.

¶ 104   The mother argues that her counsel was ineffective for failing to seek admission of the two 2016 reports which we discussed above to rebut the State's evidence as to the ground m claim. See

*supra* ¶ 98-99. Because these records fall outside of the time period under our review, the mother has not met the second prong of the *Strickland* analysis as she cannot demonstrate prejudice.

¶ 105   Based on the record, we conclude that the circuit court's finding that the mother was unfit under ground m was not against the manifest weight of the evidence and her ineffectiveness of counsel claim fails.

¶ 106   Finally, the mother argues that the court's findings that it was in the best interest of the children to terminate her parental rights were against the manifest weight of the evidence.

¶ 107   At a best interest hearing, the State has the burden of proving, by a preponderance of the evidence, that termination of parental rights is in the minors' best interest. *In re J.V.*, 2018 IL App (1st) 171766, ¶ 249. The standard of review is whether the court's decision is against the manifest weight of the evidence. *Id.* ¶ 247.

¶ 108   " '[O]nce a court has found by clear and convincing evidence that a parent is unfit, the state's interest in protecting the child is sufficiently compelling to allow the termination of parental rights.' " *Id.* (quoting *In re R.C.*, 195 Ill. 2d 291, 308 (2001)). However, the trial court cannot rely solely on fitness findings to terminate parental rights. *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). Instead, pursuant to section 1-3(4.05) of the Act, "[t]he court is required to consider factually based statutory factors, separate from those considered during parental fitness hearings, which focus upon 'the child's age and developmental needs.' " *Id.* (quoting 705 ILCS 405/1-3(4.05) (West 2000)).

¶ 109   Those statutory factors include the physical safety and welfare of the child, including food, shelter, health, and clothing; the development of the child's identity; the child's background and ties, including the familial, cultural, and religious ties; the child's sense of attachments (which includes where the child actually feels love, attachment, and a sense of being valued; the child's

sense of security; the child's sense of familiarity; the continuity of affection for the child; and the least disruptive placement alternative for the child); the child's wishes and long-term goals; the child's community ties, including church, school, and friends; the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; the uniqueness of every family and child; the risks attendant to entering and being in substitute care; and the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2016).

¶ 110 The court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his or her emotional and psychological well-being. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 78.

¶ 111 While all these factors must be considered, no single factor is dispositive. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. In addition, the trial court's best-interests determination need not contain an explicit reference to each of these factors, and we need not rely on any basis relied upon by the trial court in affirming its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. We will not reverse the trial court's judgment as to termination unless it is against the manifest weight of the evidence. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. The trial court's decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 20.

¶ 112 Our review of the evidence at the best interest hearing which included the recommendation of Unity that adoption was in the best interest of the children, under the above principles, leads to our conclusion that the trial court properly found that the termination of the mother's parental rights was in the best interest of the children.

¶ 113 The older daughters were placed in the custody of DCFS in March 2014 when M.A. was two years old, and L.A. was three months old. They have been in the care of their foster mother since 2017. The older daughters are in a safe and nurturing environment and are thriving. They have bonded with their foster mother and her immediate and extended families. Their foster mother wishes to adopt both M.A. and L.A. and has advocated for the provision of therapy for the older daughters which would assist their transition.

¶ 114 At the time of the hearing A.A. had been in the care of Casea Gordon for five years and since she the age of one year. Before that time, A.A. had been primarily residing with the grandmother and not the mother. Ar. H. also lives with this foster mother. A.A. has not only become a loved member of her foster family, but she also has contacts and relationships with her older sisters, M.A. and L.A. and those contacts would likely continue should the children be adopted as the foster mothers are cousins. A.A.'s foster mother provides a safe and nurturing environment and security for A.A. and she wishes to adopt A.A.

¶ 115 The mother does visit and have phone calls with the children and the children love and have a bond with the mother. But the mothers' contacts with the children are limited in scope and frequency and the visitations are supervised. In contrast, the foster parents have been providing consistent day-to-day care, guidance, and protection for the children over a significant period of time. It has now been over 8 years since the older daughters were in the care of the mother and A.A. has never been in her constant care. As Unity concluded, the children are in need of the continued stability which would come from their adoptions.

¶ 116 The mother argues that the trial court sensed some hesitancy when L.A. and M.A.'s foster mother, in answering the State's questions, stated that she wished to adopt them. However, upon the circuit court's inquiry, the older daughter's foster mother explained that the question about

adoption at the hearing caught her off guard because the State, earlier in the history of the case, had "tabled" the issue of adoption. L.A.'s and M.A.'s foster mother assured the trial court that she and her husband had discussed the possibility of adoption and wished to adopt them.

¶ 117   The circuit court's findings that it was in the best interest of M.A., L.A. and A.A. that the mother's parental rights be terminated were supported by the manifest weight of the evidence.

¶ 118   For these reasons, we affirm the circuit court's findings that the mother was unfit to parent the children and that termination of her parental rights was in the best interests of the children.

¶ 119   Affirmed.